v. Backpage.com, LLC, et al. May it please the Court, my name is John Montgomery. With the Court's permission, I'd like to first address the issues under Section 230 of the Communications Decency Act, and then turn to the Rule 12b-6 issues on the so-called trafficking and Chapter 93A claim. Unless there are questions from the Court, I propose to rest on our briefs on the intellectual property issues. I'm also hoping that I have two minutes left for rebuttal. Sure. The plaintiffs, as the Court knows, are three young women who were victims of sex trafficking at about age 15 through a website called Backpage.com, a website that has created a digital marketplace that we allege is devoted principally to illegal commercial sex, including with children. Our principal claims are that Backpage is engaged in intentional criminal conduct in violation of the Trafficking Victims Protection Reauthorization Act and the Parallel Massachusetts Anti-Trafficking Statute, each of which, of course, contains private rights of action. The plausibility of those claims has been enhanced in recent weeks by the assertion of the Fifth Amendment by Backpage executives in response to subpoenas from the United States Senate involving exactly the same conduct that's the subject of this action. Well, the plausibility of your complaint has to be judged on the face of your complaint, not by subsequent actions. Well, of course, Your Honor, that is true, but the Court is entitled to take judicial notice of events that occur subsequently. And since the District Court didn't assess the plausibility of the claims, I think the Court here is entitled to take judicial notice of that event. Can I ask a conceptual issue that I think will help me understand the relevance of what's about to follow? The TVPA has a standard for what counts as being a participant. That's correct. Then there's a complaint alleging certain facts that purport to say Backpage was a participant. Correct. For purposes of understanding the scope of Section 230, in a case in which there's been a complaint filed under the TVPA, are we supposed to judge whether 230 applies based on what the complaint says or based on what the TVPA says counts as a participant? Do you follow that distinction? Because the complaint, we don't have before us a ruling as to whether the complaint makes out a statement of a claim of being a participant. We know it intends to do that. So for purposes of figuring out whether 230 applies, am I supposed to be thinking about does 230 apply to a valid TVPA claim or am I supposed to be thinking about does 230 apply to your actual complaint under the TVPA? I think if I am understanding Your Honor's point, I think the Court needs to assume that the TVPRA has been violated, that we have stated a claim, or the Court needs to address the plausibility of the claims itself, one or the other. But if you leave it to the District Court to assess the plausibility of the claims, then I think that in order to address Section 230, you have to assume that we have stated a valid claim. Based on the facts that you've put forward. Based on the facts that we have put forward. Well, if you're of the view that the TVPRA actually requires more, then you're getting much closer to actually assessing the plausibility of the claims. I am. That's what I'm trying to figure out. I'm trying to figure out how to apply 230 itself, because in this case, it seems to me it may matter which of those two things I'm doing. If the TVPA required, for example, an aiding and abetting standard, the question whether 230 applies in my mind might be different than if the TVPA required something much less that looked more like just pure publishing activity. And the complaint seems to me ambiguous as to which of the two you're saying is required to make out a TVPA claim. Well, we certainly, and I should say that we argue this at some length in the District  We think that the TVPRA creates a, requires a conduct which is distinct from aiding and abetting or conspiracy. Indeed. Distinct in the sense of less than? Less. We think Congress intentionally used the word participation, inserted it in the statute in response to its perception about the significance of this problem and the importance of a private right of action. If Congress had in mind aiding and abetting standard. Does that mean you don't have to share the object of trafficking? Correct. So when you say intend in your complaint, what do you mean? They intend, you're, the back page intended to do what? Intended to participate. I know that, but what do you mean by that? What do we mean by participate? You know, as we've said, I mean, it is a broad term. It's a broad term here. It's a broad term, although perhaps less broad. Let me give you one possibility. It's a matter of the aggregate of the facts. One possibility, which would cause some concern under 230 would be, by intend you mean they intended to publish ads by sex traffickers. You mean more than that? Yes. That, much more than that. Okay, so. But it requires. What more than that? Yeah, how much more? A lot more. What is required is affirmative conduct. Remember the question under the TVPRA. When you get to affirmative conduct, don't you get to conduct, as I think you're using affirmative, don't you get to conduct which is committed with the purpose, specific purpose, of furthering the sex trafficking? In other words, I don't see where the middle ground is that you're referring to when you say much more. The much more seems to take you to a stage in which there has to be purposeful acts with the object of facilitating sex acts. And that is what we are alleging. It is not traditional publishing. What's the distinction between that and simply publishing an advertisement which you know is intended to facilitate sex trafficking by those who place the ad? A big difference. Because what we've got here is the creation of a digital marketplace that provides in effect a brokering service for the offers for sale and purchase of illegal sex. And I don't see that anything more would be required on that theory than the mere consciousness of publishing advertisements which are known by the publisher to be intended as engaging in sex trafficking. Well, Your Honor, I would concede that merely publishing would clearly be protected under Section 230. The question is whether the claim, a valid claim, for violation of the TVPRA treats that publisher, I mean treats that defendant as a publisher. And if there is a firm... Isn't the methodology here to say we've got the Section 230 immunity. You've made certain allegations in the complaint. We've got to make a determination, as I see it, as to whether the immunity extends to those allegations. If so, you're out of court. If it doesn't, if there are areas that you've alleged that get you past the immunity, the next question has got to be whether you've... The 12B6 question, whether you've plausibly stated a claim under the TVPRA is not the way to approach it. You agreed, Your Honor. Listen, we think and we proposed to Judge Stearns that the preferable way to do this is decide the 12B6 issues first. It would make this, I think, much easier. But that not having occurred, I agree entirely with Your Honor. This is what makes it critical to understand what you are saying counts as being a participant in your complaint, if that's how you want us to do it. And one possibility is you're saying that they intended to have the purpose of furthering the sex trafficking. Another is that they intended to have the purpose of furthering the publishing of sex trafficking ads. Those are different things. Those are different things. So which of the two are you pleading? Well, both. So you are pleading that they had the intent to further the sex trafficking? They intended to further the sex trafficking trade because that was in their business interests and has generated the enormous profits that we've alleged in the complaint and are reported by the Senate. So that's why they started a marketplace. That's why they host offline communications that, in effect, permit sellers and buyers to broker transactions. Why is that different from what a newspaper does when it has a special advertising section on Washington's birthday for Washington's birthday car sales? Clearly what the publisher of the newspaper is doing is trying to create a more vibrant marketplace for the sale of cars. That's what publishers do. And it seems to me that your answer to Judge Barron, in effect, says, well, in this case, instead of furthering the selling of cars, the object of the publisher or the person running the site was to create a more vibrant market or possibility of a more vibrant market in sex trade. That leaves him in the same position as the publisher of the newspaper does. But it would be entirely different if the publisher of the newspaper said, come on down, everybody, and we're actually going to negotiate these transactions at our location. That would take them, I think, just into a different realm. The transactions that they negotiate, that the publisher here, Backpage, negotiated, is the negotiation of the publication of the ad, not of the actual conduct that the TVPRA, I keep saying it incorrectly, prohibits. In this digital marketplace that they have created, they host communications offline between the sellers of illegal sex, including with children, and buyers. That occurs on their site. And it's an essential part of what we've described in the complaint as this digital marketplace that they have created. Now, there are many other aspects to the marketplace. Conduct that they've engaged in in order to make that market that they've created more vibrant, to grow that market, to increase the volume of illegal sex that's actually being provided through the site. It's still, I think, we're at the same point. If a car manufacturer, I mean, a newspaper does the same thing with respect to car sales, and they allow car transactions to go between buyer and seller online, we wouldn't normally think that it is an object of the publisher to have the sale occur. We only think the publisher's interest is to have the advertisement be one that they will publish. And I guess the same issue here for 230 purposes. Why are you pleading anything more than that? What in your complaint goes beyond that to go the further step of saying, actually, they're participating in the venture to sex traffic as opposed to advertise? No, they are participating in the venture. That is the point. And if you assume, if that's where the court ends up that you have to assume, if you assume that that's the case, then what we have is affirmative conduct that is distinct and very distinct from anything that publishers do. It's, you know, if you'll permit me, in the Likos case, in this court's Likos case, when you were discussing the treat as a publisher element, the court distinguished. Take the two minutes. Finish and then take the two minutes after. Distinguished between the case you had in front of you and a case in which the defendant was actually involved online as a host with securities transactions themselves. And if they were doing that, if they were taking that misinformation, if they were creating markets somehow otherwise supporting or advancing violations of the securities laws, at Likos I believe you were suggesting, in that opinion, may have come out differently. That's what we have here. Thank you. May it please the court, Jeffrey Pyle for the defense. Mr. Pyle, I don't want to spoil whatever sequence you have in your argument, but at some point, will you respond to the last argument that Mr. Montgomery made, that there is something more than advertising going on? There is, in fact, the provision by the so-called publisher here of an otherwise unavailable facility for negotiations between the trafficker and the victim, and at some point in your argument. Yes, Your Honor, I'd be happy to respond to that right now. The short answer is that there is nothing alleged in the complaint that is anything other than a traditional publisher, the traditional editorial functions that a publisher conducts in. And all of the plaintiff's argument is essentially an attempt to attack the website as a whole by calling it things such as a digital marketplace. But the proper focus of Section 230 inquiry is who created the content that's at issue in the case, the ads about these particular plaintiffs. And it is not contested here that those ads were created by the plaintiffs themselves or by their pimps. Your answer, as I understand it, is that there is no provision for a negotiating platform or device alleged in the complaint which takes this out of the relationship which newspapers provide between advertising and a reader who might want to respond to the ad to the advertiser. Is that correct? Yes, that's exactly correct, Your Honor. For example, the plaintiffs argue that part of what Backpage does is it steers pimps towards certain advertising language. That's one of the hallmarks of their briefing. But how does it do that? By screening draft advertisements for certain non-permitted words and phrases using an automated filtering system. That's at paragraph 54 of the complaint. Screening and filtering, as the Court held in Likos, is precisely what Section 230 is intended to incentivize and to protect against claims from. After all, all these claims can really be boiled down to the argument that Backpage.com didn't do enough to screen out and prevent the publication of these particular ads which caused this particular harm. Otherwise, the complaint is largely an attack on the entire website of Backpage rather than trying to focus on the specific advertisements that allegedly caused the injury here. The Court in Likos said that the general construct and operation of a website cannot, doesn't allow a party to avoid the subject of who created the content at issue in the case. It's really a very simple test that Congress set forth. Who created the content that's at issue? And other courts have rejected attempts to clear out. But that's on whether you are producing the content. Which, as I understand the plaintiff's complaint, they're not contesting that. They're focused on whether you're being treated as a publisher. And their contention is because of your intentions, this is not a case in which all you're being held liable for is publishing the work of another. You are being held liable, if we let it go forward, for being a participant in a sex trafficking venture. Publishers we don't normally think of as people who are participants in the ventures they advertise for. So the issue is, have they pled enough to take you beyond, at least as I see it, beyond being just a publisher to being an actual participant in the venture? I take it you agree that it is possible for a publisher, even though they're a publisher, to also be a participant in a sex trafficking venture. There could be facts, right, where the pimp himself runs a website and publishes the ads. In that certain sense, we might think that the publishing of the ads makes them a participant in the sex trafficking venture. Yes. Okay, so if that's true, then the issue here, it seems to me, is have they pled enough to show that you are a participant? On Backpage's view, what is required to make one a participant in a sex trafficking venture? Well, Your Honor, respectfully, the question is whether they have pled enough in their complaint to take the case out of Section 230, which requires immunity if the complaint treats the website as the publisher of third-party content. Correct. And you've just accepted that a publisher can also be a participant in a sex trafficking venture. And so then the question is, have they pled enough to suggest that you, your company, is a participant in a sex trafficking venture? And so I'm trying to get a sense from your perspective. You say no. Well, what do you think is required in order to plead that one is a participant in a sex trafficking venture? The answer is an emphatic and flat no. They have not pleaded enough to allege that Backpage.com is a participant in a sex trafficking venture. What they have done is alleged publisher functions and then attached labels to those allegations about publisher functions in a way that doesn't satisfy the Trombley Standard. So there are allegations, for example, about Backpage's alleged contacts with law enforcement and with any CEM, I may have the initials wrong, falsely representing what efforts they are making so that the website won't be used for illicit purposes. Those are all ordinary publisher functions? Well, Your Honor, the argument that the plaintiffs can hold Backpage liable for misrepresentations that Backpage made to other people that these plaintiffs did not rely on or were not harmed by is a particularly novel argument. But it certainly doesn't... That's not the argument. That's the misrepresentation claim. This is a question as to whether those additional statements pled in the complaint suggest that the intention of Backpage is not the intention of an ordinary publisher of an advertisement but is enough to indicate that they have an interest in the actual sex trafficking, therefore they're a participant in the venture. Well, Your Honor, as to that particular element, the TVPRA elements of the claim, there is at least one court opinion that has held or at least strongly suggested that an aiding and abetting standard is required in order to state a claim under the TVPRA. That's the U.S. v. Offyer case out of the District of Tennessee. And if that is so, your argument, I take it, is that aiding and abetting would not be satisfied merely by proof of an intent that the advertisements succeed. Because that would be, I suppose, like any publisher who publishes ads. Of course he wants them to succeed, or people wouldn't keep advertising them. Well, Your Honor, that is a perfectly fair point, and I agree with that. In a way, I'm sort of putting words in your mouth, but if I'm going astray, tell me, because this is the time for me to find out. Well, aiding and abetting, Your Honor, of course, requires that Backpage was associated with a particular criminal endeavor. And the notion that a publisher, a newspaper, becomes associated with a criminal endeavor from publishing an advertisement is a particularly aggressive view of aiding and abetting law, I would suggest. But Mr. Montgomery would say we've alleged conduct, conduct, in the complaint that goes beyond the normal functions of a publisher, and that could be aiding and abetting. That's what his response would be. And even if that were the case, then they still would require an intent to ensure the success of a particular crime. And here, there really is no allegation in the complaint, or any plausible allegation, that Backpage.com intended any particular crime to succeed. Backpage.com, after all, has terms and conditions that prohibit the posting of ads for illegal services. And there is simply no allegation of the kind of specific intent that one would need for a criminal statute. And it really boils down to the question of whether or not the claims in this case treat Backpage.com as a publisher. And when you boil down the plaintiff's allegations, they really do all surround publisher functions, at least to the extent that they're talking about how their harms came about. Plaintiff's allege that their harms came about from being advertised on Backpage's website. Their harms came about because people responded to those ads. That necessarily, that claim, when you boil it down, necessarily treats Backpage.com as the publisher of the ad, and you cannot plead around that. But see, that would be equally true if they had evidence of aiding and abetting, wouldn't it? Well, Your Honor, the cases have held that there is no criminal intent exception to Section 230's protection. This has been tried before in many cases. For example, in the M.A. case, which we cited in our brief, there was a claim brought under this very statute, 1595, by a plaintiff who sought to hold Backpage.com liable for this same civil provision associated with a criminal statute. And the M.A. court dismissed the case, holding that really what was being alleged here is the same thing that we're arguing here. This was publisher conduct that was being alleged at the heart of the case. But if there's no criminal intent exception, if we took that view, then a publisher that even did have direct evidence of their desire to have the sex trafficking venture succeed, in a more specific sense maybe than you're saying was pled here, you would take the position that 230 would bar even that from going forward. A civil claim? Yes, Your Honor, I would. Remember, Section 230 has an exception for federal criminal prosecution, but not an exception for civil claims based on statutes that may be associated with criminal statutes as well. That's why when I began here, I said that the proper focus here is on what are the facts alleged, and do those facts treat Backpage.com as a publisher of the information? Regardless of the cause of action pleaded, regardless of the standards of the TVPA, the question is whether Backpage.com is an information content provider. It is. Whether the claim stems from third-party conduct or arises from third-party conduct. It does. And whether the claim treats Backpage as a publisher. And so in a number of cases, plaintiffs have said that there was illegal conduct being hosted on the website. There have been cases about child pornography, revenge pornography, and illegal ticket scalping. In many of those cases, in all those cases really, the courts have said no, there is no exception just because somebody pleads a claim that happens to be associated with a crime. But the underlying liability there didn't depend on a claim that a person was a participant in the venture. In other words, it may be that there's no inducement exception as a general matter to Section 230, so that in a defamation case, the fact that you induced the defamation wouldn't make 230 inapplicable. But here we don't have a case in which there's liability for the publishing. The liability is for the participation in the venture, so inducement comes not through an exception to 230, it comes from the claim itself. Your Honor, I respectfully disagree. Here we do have a claim that the harm is from the publishing. There is no claim that the harm is from participation. When you actually look at the facts of the complaint, the complaint is that these plaintiffs were advertised, and it says right on the face of the complaint that as a result of the publication of the advertisements, at paragraphs 89, 99, and 103, it says as a result of the publication of the advertisements, the plaintiffs were victimized. Mr. Montgomery can call that publication participation, but that doesn't change the fundamental nature of the claim here. As Your Honor mentioned, there is no encouragement exception to Section 230, and there is no space given by the courts that have handled these cases for attempts to plead around the fundamental 230 test through repackaging publisher claims as something else, which I think is what's really going on here. Doe versus MySpace, for example. A 13-year-old girl created a profile on MySpace where she met a man who then sexually assaulted her. She sued MySpace, just like the plaintiffs do here, for alleged failure to implement age verification processes. And just like the plaintiffs here, she argued she wasn't trying to impute the content of her communications with her assailant onto MySpace, but the Fifth Circuit rejected that argument and held the claims treat MySpace as a publisher because the harms were based on third-party content. Here, the plaintiffs allege that they were advertised on Backpage.com, and as a result, they were victimized. Could you address the 93A claim? Yes, certainly. Because the 93A claim, the basis for it as I understand it, comes from the comments made to law enforcement, which does seem different than the typical kind of publisher activity. So if we thought that took it outside 230, why does the 93A claim fail? Because 93A requires showing of causation of the harm that stems from the unfair or deceptive act or practice that is alleged. And here, the plaintiffs allege an incredibly circuitous causation theory. They say that Backpage.com caused their injury by working with law enforcement and with the National Center for Missing and Exploited Children in a ruse, they say, to deflect public scrutiny, thereby lowering the supply-side transaction costs of sex trafficking, thereby allowing the online market to grow. This expanded market allegedly ensnared the plaintiffs where it otherwise might not have if Backpage had not cooperated with law enforcement. It is not a plausible allegation, even at the pleading stage, to speculate that your injuries might not have occurred but for Backpage.com's voluntary cooperation with law enforcement. 93A requires a plaintiff to show that she suffered a separate identifiable harm arising from the violation itself that bears a causal connection to the unfair or deceptive act. And as an additional matter, this was a 93A claim brought under Section 9 of 93A, which generally applies to consumer claims. The plaintiffs really aren't alleging a consumer claim here. They're alleging that Backpage.com did something that affected a market generally and that might have impacted them, but as I say, that allegation is far too speculative to survive. Is jurisdiction in the district court here solely based on federal question? Your Honor, I do not recall whether the complaint pleaded diversity jurisdiction as well. We'll check. Thank you. Thank you, Your Honor. To Judge Selye's question, the complaint did plead diversity jurisdiction. And returning to Justice Souter's question about involvement of Backpage in facilitating actual negotiations and communications between traffickers and buyers, I'd refer the Court to paragraph 50 of the complaint on pages 21 and 22, which describes that aspect of the site, including, to quote, that Backpage.com's servers host and maintain the database of e-mail conversations between pimps or traffickers and the customers without regard to the content of the messages. And there's more there. I think what you've seen in the briefs and what you just heard from Mr. Pyle make one of the points that we'd like the Court to take away, which is that Backpage is proposing a radical interpretation of Section 230, which essentially reads the treat as a publisher element out of the statute. All that's required, according to Backpage, which is why they can reach both the trafficking claims and the 93A claim, which I agree with Judge Barron is entirely different. They can reach it all because they can say it has some nexus to publishing. Publishing is, or the content of a message is, somehow a part of the causal chain that underlies the claims, and that's enough. But that is not what treat as a publisher means. It's not what Congress had in mind because that leaves you with a statute in which Congress, and I would suggest unwittingly, has created an exemption, a free pass, or as the Ninth Circuit put it, a lawless no man's land. Just to get a sense of the limits of your argument, suppose we had a different kind of Backpage in which they did all these same types of activities, but the people who seemed to use the site were people who wanted to say nasty and scurrilous things about people. So they published defamatory comments all the time. And when you looked at all the different things they did and people got mad at them and they said to other people, no, we're going to police defamatory comments. We promise that we'll do all the same types of things. Then you bring a defamation claim and they try and hold the website liable for publishing the defamation claims. Would you say 230 does not apply as a bar then? Or is your case different than that? Our case is much different. Why? What is it about it? Because we've crossed a line of affirmative conduct which violates the criminal law, which violates an established standard that Congress has created, albeit quite recently, which says it is important to the enforcement of our criminal law that we provide private rights of action. Crossing that line puts this case in an entirely different dimension and poses, if the court agrees that 230 doesn't apply, really no risk to the otherwise very legitimate policy objects of Section 230. And after all, all that happens here if 230 doesn't apply at this stage and assuming that we have stated a claim is we get to proceed to discovery. We get to shed a little bit of light on what is going on with Backpage and to establish whether our allegations really can be made out. Thank you. Thank you, Your Honor.